**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

JAMES SUKHU,

                       Petitioner,

          -against-

PEOPLE OF THE STATE OF NEW YORK,

                      Respondent.
-------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

19-CV-410 (KAM)

**TISCIONE, United States Magistrate Judge:**

On January 3, 2019, Petitioner James Sukhu filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Pet., ECF No. 1. Sukhu seeks relief from his August 12, 2015 convictions, following a jury trial in the Queens County Supreme Court, of assault in the first degree, robbery in the first degree (four counts), robbery in the second degree (four counts), and one count of assault in the second degree. The Honorable Kiyo A. Matsumoto referred Bernard's petition to me for a report and recommendation in accordance with 28 U.S.C. § 636(b). I recommend that the Petition be DENIED.

## I.     BACKGROUND

On the evening of September 29, 2013, Kelly Seecharran and Anthony Roopnarine were enjoying social drinks with friends at a home in Queens County. Tr. 209:1–23. Sukhu was walking up and down the block "cursing and calling people out to fight." Tr. 213:5–6. When Seecharran left to go home through a nearby alleyway, Sukhu directed his attention at Seecharran and started cursing at him. Tr. 209:24–25; 210:24–25; 211:1–6. Sukhu was with Tanya Singh (also referred to as Tanya Boobhoo throughout trial) at the time. Tr. 211:8. Seecharran asked Sukhu if he had a "problem" with him and Sukhu responded that he did not. Tr. 211:12–15. Seecharran asked if "everything" was "good" and Sukhu responded, "yes." Tr. 211:19–20. Afterwards, they shook hands. Tr. 211:19–20. Seecharran and Sukhu had not fought in the past. Tr. 211:24–25.

1

A similar incident happened the next day.  Tr. 213:1–19.  Again, Sukhu was "going up and down the block cursing and calling people out to fight."  Tr. 213:5–6.  He asked Seecharran and Roopnarine if they wanted to fight.  Tr. 213:8–9.  They both ignored him.  Tr. 213:18. Seecharran and Roopnarine went back to socializing with their friends, including Kawall Shabaint and a man referred to as "Jaggy."  Tr. 213:20–23; 275:1–18; 310:22–23.  At around 8:10 p.m., a van arrived at the home across the street from where Seecharran and Roopnarine were hanging out.  Tr. 310:20–21; 311:12–14.  A man with dreadlocks and a pony tail approached the group and asked, "who we got to talk to?"  Tr. 310:22–25; 311:2.  As this man was talking to them, approximately four to six men and two women got out of the vehicle across the street and starting walking towards Seecharran, Roopnarine, and their friends.  Tr. 215:17– 18; 311:12–21; 314:3.  Sukhu was in the yard nearby and walked over with the group.  Tr. 216:6–9.  One person had a baseball bat and another had a metal pipe, but Sukhu was not carrying a weapon.  Tr. 215:19–25; 216:1.

When the group reached Seecharran, Roopnarine, and their friends, the group attacked them.  Tr. 216–17; 311–313.  One of the attackers struck Roopnarine on the jaw with a baseball bat.  Tr. 216:14–16; 312: 6–10.  Then Sukhu repeatedly punched and kicked Roopnarine all over his upper body and his face.  Tr. 216:22–25; 217:1–6; 312:15–25; 313:1.  While Roopnarine was on the ground, someone stole a bracelet and chain that he was wearing.  Tr. 314:16–22.  Several men, one of whom was Sukhu, then turned to Seecharran and punched and kicked him all over his body.  Tr. 217:14–24.  While Seecharran was lying on the ground, one of the attackers ripped a bracelet from his wrist and a chain from his neck.  Tr. 218:5–21.

Two neighbors alerted the police after they heard loud noises and saw fighting outside their homes.  Tr. 263:1–9; 269:2–5.  Seecharran and Roopnarine were transported to the hospital; Seecharran received forty stitches due to a laceration on his back.  Tr. 220:15–23; Tr. 370–71. Roopnarine underwent surgery to repair a fracture to the left side of his jaw and, as a result, had his jaw wired shut for several weeks after the surgery.  Tr. 316–17; 373–74.  The day after the incident, the police discovered that the home next door to where the attack took place contained

video surveillance equipment that captured and recorded the incident.  Tr. 348–351.

Sukhu was arrested and charged with Assault in the First Degree, N.Y. Penal Law § 120.10(1), for causing serious physical injury to Anthony Roopnarine with a dangerous instrument, five counts of Robbery in the First Degree, N.Y. Penal Law § 160.15(1), (3), one count under subsection one for causing serious physical injury to Anthony Roopnarine and four counts under subsection three for the robberies of Anthony Roopnarine and Kelly Seecharran with the use of a baseball bat and a metal pipe against each, four counts of Robbery in the Second Degree, N.Y. Penal Law § 160.10(1), (2)(a), two counts under subsection one for the robberies of each victim having been aided by another and two counts under subsection two for the robberies of each victim causing physical injury, and Assault in the Second Degree, N.Y. Penal Law § 120.05(2), for causing physical injury to Kelly Seecharran with a dangerous instrument.

On June 8, 2015, Sukhu proceeded to a jury trial in the Supreme Court, Queens County. *See* Tr.  The trial concluded on June 16, 2015; the jury convicted Sukhu of all counts except the first-degree robbery count (with a metal pipe) and the second-degree robbery count related to Anthony Roopnarine.  Tr. 521–22.  On August 12, 2015, the court sentenced Sukhu to eight years' imprisonment on the first-degree assault and first-degree robbery counts, three-and-one-half years' imprisonment on the second-degree robbery counts, and two years' imprisonment for second-degree assault.  Sentencing Tr. 16–17.  All of the sentences were ordered to be served concurrently.  Sentencing Tr. 17.

Sukhu appealed his convictions to the New York Supreme Court, Appellate Division, Second Department.  He filed a brief, through counsel, arguing that: (1) the evidence was insufficient to prove that he had the requisite mental state to be convicted as a principal or accomplice for any of the robbery counts, and his robbery counts were against the weight of the evidence, because there was no proof that he knew that either victim wore a chain and bracelet, that he took the items from them, or that he knew that anyone else did; (2) his two convictions for first-degree robbery of Seecharran by means of different dangerous instruments violated his

3

double jeopardy rights because there was no evidence that Seecharran was robbed twice during the incident (and, alternatively, counsel was ineffective for failing to object on double jeopardy grounds); and (3) the state violated his fair trial rights during summation by misinstructing the jury about accomplice liability, misdirecting the jury about how to evaluate the video of the incident, and offering personal opinions (and, alternatively, counsel was ineffective for failing to object to these comments).  Aff. Opp. (Pet'r's Direct Appeal Br.), ECF No. 8-1.

In a decision and order dated January 31, 2018, the Appellate Division affirmed the judgment and sentence.  *See People v. Sukhu*, 157 A.D.3d 973 (2d Dep't 2018).  The court held that evidence of Sukhu's conduct and surrounding circumstances was legally sufficient to establish that he possessed the requisite criminal intent to support the robbery convictions.  *Id.* at 973.  Further, the court held that the "verdict of guilty was not against the weight of the evidence."  *Id.*  The court also held that Sukhu's claim that his two first-degree robbery counts were multiplicitous was unpreserved for appellate review but, in any event, without merit.  *Id.* at 974.  Finally, with respect to the prosecutor's allegedly improper comments during summation, the court held that these objections were also unpreserved for appellate review, since counsel "either made only one-word objections, failed to request curative instructions, or failed to timely move for a mistrial on this ground[.]"  *Id.* (citations omitted).  Further, with respect to the allegedly improper comments, the court held that the comments "did not deprive the defendant of a fair trial, and any other error in this regard was harmless, as there was overwhelming evidence of the defendant's guilt and no significant probability that the error contributed to the defendant's conviction[.]"  *Id.* (citations omitted).  The Court of Appeals denied Sukhu's application for leave to appeal.  *See People v. Sukhu*, 31 N.Y.3d 1018 (2018) (DiFiore, C.J.).

Petitioner Sukhu then moved, *pro se*, to vacate the judgment of conviction pursuant to New York Criminal Procedural Law § 440.10(1)(b).  *See* Aff. Opp. (Motion to Set Aside Judgment), ECF No. 8-1.  Sukhu argued that his conviction should be vacated because it was procured by duress, misrepresentation, or fraud on the part of the prosecutor.  *Id.*; Aff. Opp. (Short Form Order and Mem. Mot. Vacate J.), ECF No. 8-3.  Sukhu also argued that his trial

counsel was ineffective for failing to object to many of the prosecutor's remarks during summation; for failing to move for a mistrial based upon the presence of a juror who alleged knew the defendant; and for failing to move for a mistrial based upon a witness who allegedly testified under a false name.  Mot. Set Aside J.; Mem. Mot. Vacate.  Finally, Sukhu argued that his dual convictions for first-degree robbery violated his federal and state protections against double jeopardy.  Mot. Set Aside J.; Mem. Mot. Vacate J.

In a memorandum and order dated November 8, 2018, the court denied Petitioner's motion to vacate in its entirety.  Mem. Mot. Vacate J. at 6.  The court found that Sukhu had previously raised several of the claims in his direct appeal—namely, his claims regarding prosecutorial misconduct; ineffective assistance of counsel regarding a failure to object to the alleged misconduct; and that his two first-degree robbery convictions violated double jeopardy. *Id.* at 4.  The court found that the Appellate Division, Second Department held that all of these claims were unpreserved and meritless and, thus, the court found that it must deny the claims under New York Criminal Procedure Law § 440.10(2)(a).  *Id.*

Next, the court denied Sukhu's claim regarding ineffective assistance of counsel for failing to move for a mistrial based on allegations that: (1) a juror personally knew the defendant and (2) a witness had testified under a false name.  *Id.* at 5.  The court found that both of these claims could have been raised on direct appeal, yet were not, so the court denied the claims as unpreserved under New York Criminal Procedure Law § 440.10(2)(b).  *Id.*  In any event, the court found that the ineffective assistance claims were meritless because the record established that counsel provided highly competent representation.  *Id.* at 5–6.

Petitioner Sukhu timely filed the present habeas application on January 3, 2019.  Pet., ECF No. 1; *see* 28 U.S.C. § 2244(d)(1)(A).

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), sets forth the standard that federal courts apply when reviewing state court decisions on habeas review.  Under that statute, when a petitioner seeks a writ of

habeas corpus vacating a conviction for errors of law, the petitioner must show that the merits of her claim were adjudicated in state court and that the adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A decision is contrary to "clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

If the decision is not contrary to Supreme Court precedent, then the much more deferential "unreasonable application" test applies, and under that standard a petitioner may not receive "federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Chrysler v. Guiney*, 806 F.3d 104, 118 (2d Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).  A state court decision is an "unreasonable application" of federal law "if the state court identifies the correct governing principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413.  The Supreme Court has emphasized that the reasonableness of the application of the law is to be assessed objectively rather than subjectively.  *Id.*

For the reasons discussed below, the Court finds that none of the issues raised in the instant petition for habeas corpus state a claim for the writ and therefore the petition should be denied.

## III.    ANALYSIS

In his application for habeas relief, Sukhu raises three claims: (1) that his double jeopardy rights were violated when he was convicted for two counts of first-degree robbery; (2) that he was denied effective assistance of counsel when his counsel: (a) failed to object during the prosecutor's summation; (b) failed to move for a mistrial; (c) failed to object on double jeopardy grounds; (d) failed to preserve the multiplicitous argument for appeal; and (e) failed to object to the prosecutor's alleged misconduct; and (3) that he was denied due process rights because the prosecutor's key witness testified under a false name.  Pet., ECF No. 1.

6

## A. Petitioner's Double Jeopardy Claim

Sukhu was charged with two counts of first-degree robbery against Seecharran under section 160.15(3) of the New York Penal Law.  Section 160.15 states, in relevant part:

> A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [u]ses or threatens the immediate use of a dangerous instrument[.]

N.Y. Penal Law § 160.15(3).  Sukhu argues that his double jeopardy rights were violated when he was convicted twice of first-degree robbery because there was no evidence that Seecharran was robbed twice during the incident.

At the trial, the Honorable Barry A. Schwartz instructed the jury as follows on the two counts of first-degree robbery that pertained to Kelly Seecharran.  With respect to the first count of first-degree robbery against Seecharran (count five of the indictment), the court stated,

> For you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt, both of the following two elements.  That on or about September 30, 2013, in the County of Queens, the defendant James Sukhu acting in concert with other persons forcibly stole property from Kelly Seecharran.  And two, that in the course of the commission of the crime, or in the immediate flight therefrom, the defendant or another participant in the crime possessed a dangerous instrument, to wit, a baseball bat and used or threatened the immediate use of that dangerous instrument.

Tr. 503:22–25; 504:1–5.  With respect to the second count of first-degree robbery against Seecharran (count six of the indictment), the court made clear that the count "also applies to Kelly Seecharran," Tr. 504:15, and, in order to find Sukhu guilty beyond a reasonable doubt, the jury must find facts to establish the first element (stated above) and that "the defendant or another participant possessed a dangerous instrument, to wit, a metal pipe and used or threatened the immediate use of that dangerous instrument."  Tr. 505:6–8.

In his brief to the Appellate Division, the petitioner argued that "[d]ouble jeopardy violations are not subject to preservation."  Pet'r's Direct Appeal Br. at 42.  Alternatively, he argued that the court "should still reverse one of [his] convictions for first-degree robbery of Mr. Seecharran in the interest of justice."  *Id.*  Finally, in the event that the court found the claim

unpreserved and declined to reverse for the interests of justice, the petitioner argued that the court should find his counsel ineffective for failing to move to dismiss the allegedly multiplicitous counts. *Id.*

The Appellate Division held that the "defendant's contention that two of the counts of robbery in the first degree should have been dismissed as multiplicitous is unpreserved for appellate review and, in any event, without merit." 157 A.D.3d at 974 (citing N.Y. Crim. Proc. Law 470.05(2); *People v. Cruz*, 96 N.Y.2d 857, 858 (2001); *People v. Campbell*, 120 A.D.3d 827 (2d Dep't 2014)). The court concluded by stating that the "defendant's remaining contentions are without merit." *Id.*

Under section 470.05(2) of New York Criminal Procedure Law, a defendant must make a contemporaneous objection to an alleged error to preserve a claim for appellate review. A federal court does not review the merits of a habeas claim if there is an adequate and independent state law basis for denying the claim on habeas review. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *holding modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012); *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011). Thus, the petitioner's failure to object is fatal to his present claim if section 470.05(2) is an "adequate" and "independent" state law basis for supporting the petitioner's convictions.[1]

For a state law ground to be an "adequate" bar to habeas review, it must be "firmly established and regularly followed by the state in question." *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)); *see also Olson v. Connolly*, No. 15-CV-06498 (KPF) (SN), 2016 WL 11483848, at *3 (S.D.N.Y. Apr. 15, 2016), *R&R adopted*, 2016 WL 5940915 (S.D.N.Y. Oct. 13, 2016). A state procedural rule is "independent" if it "is a nonfederal ground adequate to support the judgment." *Martinez v. Ryan*,

---

[1]    This Court deems the petitioner's double jeopardy claim to be unpreserved even though the Appellate Division held that the claim was not preserved but, "in any event, without merit." *See Smith v. Herbert*, 275 F. Supp. 2d 361, 366 (E.D.N.Y. 2003) ("When a state court 'says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved.'" (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir.1996)); *see also Mullings v. Laffin*, No. 13-CV-139 (KAM), 2014 WL 3897566, at *5 (E.D.N.Y. Aug. 8, 2014).

566 U.S. 1, 9 (2012).  There is no question that section 470.05(2) acts as an "independent" bar, *see, e.g.*, *Cotto*, 331 F.3d at 239; the parties dispute whether the petitioner's failure to object acts as an "adequate" basis under New York law.

New York courts consistently require defendants to preserve double jeopardy claims that are premised on multiple punishments for the same offense.  The Double Jeopardy Clause "prohibits three types of prosecutions: '(1) a second prosecution for the same offense after acquittal; (2) the second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.'"  *Olson*, 2016 WL 11483848, at *3 (quoting *People v. Gonzalez*, 99 N.Y.2d 76, 82 (2002)).  New York courts require that the third type of claim, one alleging a double jeopardy violation based on multiple punishments, be preserved in order to be addressed on appeal.  *See id.* (citing *People v. Duperroy*, 88 A.D.3d 606, 607 (1st Dep't 2011); People v. Jordan, 77 A.D.3d 406, 407 (1st Dep't 2010); People v. Johnson, 299 A.D.2d 287, 287 (1st Dep't 2002)); *see also People v. Williams*, 14 N.Y.3d 198, 220 (2010) (recognizing that multiple punishment double jeopardy claims are subject to preservation requirements unless they implicate the jurisdiction of the court); *People v. Gordon-Patterson*, 170 A.D.3d 1037, 1038 (2d Dep't 2019); *People v. Blount*, 129 A.D.3d 1303, 1304 (3d. Dep't 2015); *People v. Herrera*, 99 A.D.3d 813 (2d Dep't 2012) (collecting cases); *People v. Thompson*, 34 A.D.3d 931, 932 (3d. Dep't 2006); *cf. People v. Alonzo*, 16 N.Y.3d 267, 269 (2011) (addressing merits of double jeopardy claim where defendant moved to dismiss allegedly multiplicitous counts before trial).  Thus, because the petitioner failed to move to dismiss the allegedly multiplicitous count in the trial court, and because section 470.05(2) of New York Criminal Procedure Law—a nonfederal ground that is sufficient to support the judgment—is firmly established and regularly followed by New York courts, there is an "adequate" and "independent" state law basis to deny his claim.

But despite the petitioner's procedural default, he may still obtain federal review of his claim if he can show good cause and ensuing prejudice for his failure to preserve the double jeopardy argument.  *Coleman*, 501 U.S. at 750.  "To establish 'cause' . . . the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply

with the State's procedural rule.'" *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "To show prejudice, a prisoner must show 'not merely that errors ... at trial created a possibility of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions.'" *Speringo v. McLaughlin*, 202 F. Supp. 2d 178, 189 (S.D.N.Y. 2002) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *accord McCrae v. Artus*, No. 10-CV-2988 (RRM), 2012 WL 3800840, at *4 (E.D.N.Y. Sept. 2, 2012) (quoting *Murray*, 477 U.S. at 492).

The petitioner argues that, in the event that the double jeopardy claim is found to be unpreserved, it was due to his trial counsel's constitutionally deficient representation. The cause standard may be satisfied by showing ineffective assistance of counsel.[2] *Murray*, 477 U.S. at 488 (quoting *Strickland v. Washington*, 466 U.S. 668 (1984)); *see also Tavarez*, 814 F.3d at 650.

To show constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness and, but for counsel's alleged errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Premo v. Moore*, 562 U.S. 115, 121 (2011). A petitioner must overcome the "strong presumption" that "counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 562 U.S. at 121 (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

"'Surmounting *Strickland*'s high bar is never an easy task.' *Padilla v. Kentucky,* 559 U.S. 356, 371 [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-

---

[2]     Cause may also be established if the petitioner's claim is a "novel" claim or if the petitioner is actually innocent. Neither exception applies here. Double jeopardy jurisprudence is well-developed. *See, e.g.*, *Blockburger v. United States*, 284 U.S. 299, 303 (1932) (announcing the double jeopardy test); *People v. Brinson*, 216 A.D.2d 900, 901 (4th Dep't 1995) (reversing robbery conviction where defendant was convicted of two counts of robbery for one forcible taking of property). Thus, the petitioner's claim was not "so novel that its legal basis [was] not reasonably available to counsel." *United States v. Whitman*, 115 F. Supp. 3d 439, 443 (S.D.N.Y. 2015) (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)), *aff'd*, 740 F. App'x 218 (2d Cir. 2018). Nor can the petitioner show that he is "actually innocent" of the crimes of which he was convicted. *Kinley v. Artus*, 571 F. App'x 30, 31 (2d Cir. 2014) (quoting *Carrier*, 477 U.S. at 496).

trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S., at 689–690 [104 S.Ct. 2052]. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' *Id.,* at 689 [104 S.Ct. 2052]; see also *Bell v. Cone,* 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id.,* at 689 [104 S.Ct. 2052]; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles,* 556 U.S., at 123, 129 S.Ct., at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123 [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."

*Premo*, 562 U.S. at 122–23 (quoting *Richter*, 562 U.S. at 104–05).

Before assessing whether the petitioner has alleged ineffective assistance sufficient to establish cause for his procedural default, however, this Court must first determine the applicable standard of review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts cannot grant writs of habeas corpus under § 2254 by engaging only in *de novo* review when it is unclear whether AEDPA deference applies[.]"). The Second Circuit has recognized that there is a circuit split on this issue: "Our sister courts have split on the issue of whether *de novo* review or AEDPA deference applies when a habeas petitioner advances a claim of ineffective assistance as cause to excuse procedural default (rather than as independent grounds for habeas relief)." *Tavarez*, 814 F.3d at 650 (footnote and citations omitted). Even though the Second Circuit has not yet provided guidance on the issue, *see id.*; *Bramble v. Griffin*, 543 F. App'x 1, 4 n. 1 (2d Cir. 2013), courts in this Circuit have repeatedly applied AEDPA deference when evaluating

whether a petitioner's *Strickland* claim is sufficient to show cause to excuse a procedural default. *See Hernandez v. Superintendent of Clinton Corr. Facility*, No. 19-CV-5832 (BMC), 2019 WL 6716738, at *3 (E.D.N.Y. Dec. 10, 2019); *Chestnut v. Lamanna*, No. 19-CV-00133 (ERK), 2019 WL 5309964, at *5 (E.D.N.Y. Oct. 21, 2019); *Finley v. Graham*, No. 12-CV-9055 (KMK) (PED), 2016 WL 47333, at *12 (S.D.N.Y. Jan. 4, 2016); *Pierotti v. Walsh*, No. 03-CV-3958 (DRH), 2015 WL 2337316, at *9 (E.D.N.Y. May 13, 2015), *vacated and remanded on different grounds*, 834 F.3d 171 (2d Cir. 2016); *Tavarez v. Larkin*, No. 12-CV-4015 (BMC), 2014 WL 2048419, at *12 (E.D.N.Y. May 18, 2014), *aff'd*, 814 F.3d 644 (2d Cir. 2016).

In finding that the AEDPA standard should be applied to an ineffective assistance claim proffered to excuse procedural default, the District Court in *Tavarez* noted that "[a] federal habeas court cannot consider ineffective assistance as constituting cause and prejudice unless that ineffective assistance claim has been exhausted in state court." *Tavarez*, 2014 WL 2048419, at *12 (citing *Edwards v. Carpenter*, 529 U.S. 446, 447 (2000)). "And if it has been exhausted in state court," continued the *Tavarez* court, "there seems no more basis for reviewing it *de novo* than there would be for any other exhausted claim." *Id.* This Court agrees with the *Tavarez* court that AEDPA deference should apply to ineffective assistance claims proffered to excuse procedural default. That especially makes sense here where the Appellate Division explicitly denied the double jeopardy claim on its merits, which necessarily rejected the argument that the trial counsel was ineffective for failing to move to dismiss the allegedly multiplicitous count.

Under that standard, the petitioner cannot show that the Appellate Division unreasonably applied clearly established federal law, *as established by the Supreme Court*, when it denied his *Strickland* claim on the merits. Even assuming that the petitioner can show that his counsel performed in a constitutionally deficient manner, he cannot show that he was prejudiced under AEDPA deference pursuant to binding Second Circuit caselaw because he was sentenced to a concurrent term of imprisonment for the allegedly multiplicitous conviction.

In *Tavarez v. Larkin*, the Second Circuit affirmed the denial of habeas relief to a petitioner claiming ineffective assistance of counsel. 814 F.3d 644, 649 (2d Cir. 2016).[3] The court held that, "even assuming, *arguendo*, that trial counsel in this case acted unreasonably in failing to object[,]" the petitioner could not show that the state court unreasonably applied *Strickland* because the petitioner was sentenced to two concurrent terms of imprisonment. *Id.* In so holding, the court discussed *Ball v. United States*, 470 U.S. 856, 864–65 (1985), a double jeopardy case where the Court vacated one of two convictions on direct appeal instead of running the sentences concurrently because of the potential collateral consequences of an additional criminal conviction. *Tavarez*, 814 F.3d at 865 (citing *Ball*, 470 U.S. at 865). Yet, even though "*Ball* is suggestive of the Supreme Court's ultimate decision on the issue before us, were the Court ever to reach it, it does not 'clearly establish' the proposition for purposes of AEDPA review." *Id.* (brackets omitted). Thus, the court concluded, "it can hardly be a clearly established principle of Supreme Court jurisprudence that the collateral consequences of a conviction alone suffice to establish *Strickland* prejudice." *Id.*

In this case, as in *Tavarez*, the petitioner argues that his counsel was ineffective and, as a result, he was convicted of an additional crime and sentenced to an additional concurrent term of imprisonment. As such, the petitioner's term of imprisonment would not be altered if one of the convictions supporting the eight-year sentence were to be vacated.[4] This Court recognizes that collateral consequences might result from the allegedly multiplicitous conviction, but following *Tavarez* and binding Supreme Court precedent, this Court cannot find that the Appellate Division unreasonably applied a clearly established principle of Supreme Court jurisprudence when it denied the petitioner's claim because the petitioner cannot establish *Strickland* prejudice under AEDPA deference.

---

[3]    The following discussion of *Tavarez* focuses on the court's analysis of the standalone ineffective assistance claim and not on the cause and prejudice section of the court's opinion.

[4]    The petitioner was sentenced to five concurrent terms of eight years' imprisonment for counts one, two, three, five and six of the indictment. *See* Sentencing Tr. 16–17.

### B. Petitioner's Ineffective Assistance of Counsel Claims

### a. Failure to Object During Summation

The petitioner argues that he was denied effective assistance of counsel when his trial counsel failed to object to the prosecutor's summation.[5]  Specifically, he complained about three errors in his brief to the Appellate Division.  *See* Aff. Opp. (Pet'r's Direct Appeal Opening Br.), ECF No. 8-3 at 20.  He argues that the prosecutor "misinstruct[ed] [jurors] on accomplice liability[,]" *id.* at 19, "invaded the province of the jury" in speaking about how to evaluate video evidence, *id.* at 20–21, and acted "as an unsworn witness against the defendant." *Id.* at 21–22. The petitioner asked the Appellate Division to reverse for ineffective assistance of counsel in the event that the court declined to reverse on the basis of the alleged prosecutorial misconduct because his counsel failed to object to nearly all of the prosecutor's summation misconduct and failed to move for a mistrial.

The Appellate Division stated the following with respect to the prosecutor's allegedly improper summation remarks:

> The defendant contends that certain remarks made by the prosecutor during summation deprived him of a fair trial and constituted reversible error, because she allegedly mischaracterized the evidence, vouched for the credibility of the People's witnesses, and made inflammatory comments.  The defendant's contentions are unpreserved for appellate review, since he either made only one-word objections, failed to request curative instructions, or failed to timely move for a mistrial on this ground.  In any event, most of the comments alleged to be improper were either fair comment on the evidence, or responsive to argument and theories presented in the defense summation.  To the extent that any of the prosecutor's remarks were improper, they did not deprive the defendant of a fair trial, and any other error in this regard was harmless, as there was overwhelming evidence of the defendant's guilt and no significant probability that the error contributed to the defendant's conviction.

---

[5]     AEDPA accords deference to state adjudications on the merits.  This Court finds that the Appellate Division adjudicated the petitioner's ineffectiveness claims on the merits, even though the court's decision does not give reasons or cite federal law in denying the claims.  *See Richter*, 562 U.S. at 100 ("§ 2254 does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"); *see also Sellan v. Kuhlman*, 261 F.3d 303 (2d Cir. 2001); *Nazario v. Miller*, No. 15-CV-2892 (PGG), 2020 WL 114516, at *10 (S.D.N.Y. Jan. 10, 2020).

*Sukhu*, 157 A.D.3d at 973.  These claims were raised by the petitioner on § 440.10 review.  *See* Mot. Set Aside.  That court also denied the claims.  *See* Mem. Mot. Vacate J.

The New York Court of Appeals has stated that counsel should be "afforded the latitude by way of comment, denunciation or appeal in advocating counsel's cause." *People v. Wright*, 25 N.Y.3d 769, 780 (2015) (citation and brackets omitted).  Even so, there are well-defined limits to counsel's summation: counsel must remain within "the four corners of the evidence and avoid irrelevant comments which have no bearing on any legitimate issue in the case." *Id.*; *see also People v. Turner*, 214 A.D.2d 594, 594 (2d Dep't 1995).  "[T]he District Attorney may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferrable from the evidence." *People v. Fisher*, 18 N.Y.3d 964, 966 (2012).  Summation comments should be looked at in the context of the summation delivered by opposing counsel and should be deemed proper if the comments are responsive to arguments and issues raised by the defense. *People v. Marks*, 6 N.Y.2d 67, 77–78 (1959); *People v. Carrasquillo-Fuentes*, 142 A.D.3d 1335, 1338 (4th Dep't 2016).  Courts should not review a prosecutor's summation to ensure that the comments are "perfect[,]" *Marks*, 6 N.Y.2d at 68, but rather should determine whether the comments are "a fair response to defense counsel's summation and [do] not exceed the bounds of legitimate advocacy." *Carrasquillo-Fuentes*, 142 A.D.3d at 1338 (quoting *People v. Melendez*, 11 A.D.3d 983, 984, 782 N.Y.S.2d 893 (4th Dep't. 2004)).

i. <u>Accomplice Liability</u>

With respect to the prosecutor's arguments regarding accomplice liability, the petitioner takes issue with the following statements made by the prosecutor:

> If you find that the defendant hit Anthony [Roopnarine] or hit Kelly [Seecharran] or hit both of them or did anything to them, you must find him guilty.

Tr. 478:4–6.  Immediately after this statement, defense counsel objected, and the court sustained the objection and responded that the court "will instruct you on the law of acting in concert, folks." Tr. 478:8–9.  Then, the prosecutor stated,

> You cannot find him not guilty because he didn't have the bat or the knife or the pipe.  Please listen carefully to the Judge's instructions.

Tr. 478:11–13.  The petitioner argues that the prosecutor's statements were wrong in at least two ways:  (1) the prosecutor failed to specify the state of mind requirement for accomplice liability and therefore lowered the People's burden of proof; and (2) the prosecutor "wrongly informed the jury that a bare finding that Mr. Sukhu 'hit [Mr. Roopnarine] or hit [Mr. Seecharran] or hit both of them or did anything to them' would suffice to convict him of the robbery counts." Pet'r's Direct Appeal Br. at 19.  The petitioner claims that his trial counsel was ineffective for failing to object to these allegedly improper comments.

The petitioner cannot show that the Appellate Division applied *Strickland* in an unreasonable fashion because the petitioner cannot show that he was prejudiced by his counsel's alleged deficient performance.  The Appellate Division held that "[t]o the extent that any of the prosecutor's remarks were improper, they did not deprive the defendant of a fair trial . . . ."  157 A.D.3d at *2.  Petitioner's cannot show that the jury was "wrongly informed" by the prosecutor's initial comments after the court sustained his counsel's objection and correctly informed the jury that the court would instruct them on the law.  *See People v. Williams*, 14 A.D.3d 519 (2d Dep't 2005) (finding that any alleged prejudice was alleviated when the court sustained defendant's objections and provided curative instructions).  Furthermore, the jury sought guidance from the court on the definition of accomplice liability during deliberations, indicating that the jurors followed the court's instructions and were not swayed by the prosecutor's allegedly improper comments.  *See* Tr. 515–17.  Accordingly, the petitioner cannot show that his counsel was ineffective for failing to object because he cannot show that he was prejudiced by the prosecutor's allegedly improper comments.

ii.  Instruction on Video Evidence

Petitioner also complains about a later instance in the prosecutor's summation in which the prosecutor states the following regarding the video evidence:

THE PEOPLE:  Each witness identified the defendant on the video.  These witnesses know the defendant.  One of them is related to him.  One of them lived with him.  One of them is his neighbor.  Kelly had a situation with him the day before.  They know the defendant.

16

It's not whether you as jurors can make the identification.  It's whether these witnesses can make the identification.

Tr. 484:20–25; 485:1–2.  Immediately after this statement, defense counsel objected, but the court overruled his objection.  *See* Tr. 485:3–5.  The prosecutor went on to state, "Don't try to identify the defendant. . . . .  Don't try to make that identification."  Tr. 485:7–8, 10–11.

The petitioner cannot show that the Appellate Division unreasonably applied *Strickland* in denying this ineffective assistance claim.  Counsel's initial objection to the prosecutor's summation was overruled and there is no indication that a further objection to the same line of argument would have been sustained.  *See, e.g.*, *People v. Blanchard*, 63 A.D.3d 1291, 1292 (3d Dep't 2009) (rejecting ineffectiveness claim where counsel failed to renew previously unsuccessful objection).  Thus, the petitioner cannot overcome the presumption that his counsel rendered effective assistance.  *See People v. Stultz*, 2 N.Y.3d 277, 287 (2004) ("A defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success.").

### iii.   Unsworn Witness

Finally, the petitioner complained about the prosecutor acting as an unsworn witness during his summation.  Pet'r's Direct Appeal Br. at 21–22.  Petitioner argued that the prosecutor acted as an unsworn witness in at least seven ways: (1) by making baseless claims about his alleged motive and planning; (2) by speculating that he summoned the assailants by phone; (3) by mischaracterizing the incident and its aftermath; (4) by making inaccurate statements about the video; (5) by making inaccurate statements about the pre-trial interactions of the people's witnesses; (6) by vouching for the credibility of the people's witnesses; and (7) by denigrating the defense witness.  *Id.* at 22–36.

*(1) Baseless claims about alleged motive and planning*

Petitioner argues that the prosecutor made inaccurate statements during her summation remarks about Sukhu's purported motive and planning.  Sukhu argues that the prosecutor made improper statements when she stated that the jury should blame Sukhu "because he did it.

Because he is guilty. He planned the attack." Pet'r's Direct Appeal Br. at 22 (quoting Tr. 471:18–19). Sukhu argues that the prosecutor also made an improper statement when she stated that the incident was an "intentional, motivated, and planned attack by this defendant." *Id.* (quoting Tr. 465:12–13). Sukhu argues that the prosecutor made improper comments when she stated that Sukhu waited until the next day because he did not have any others to help him with the attack. *Id.* (quoting 467–68).

Sukhu cannot show that the Appellate Division unreasonably applied *Strickland* when it denied his ineffective assistance of counsel claim for counsel's failure to object or move for a mistrial following the prosecutor's comments regarding planning and motive during summation. The prosecutor fairly summarized the evidence at trial and made permissible inferences based on that evidence. The evidence showed that the petitioner got into an argument with Seecharran on the day before the petitioner attacked Seecharran and Roopnarine. A fair inference from the evidence is that the petitioner waited until the next day so that he would have greater assistance in carrying out the planned attack, and, thus, counsel was not ineffective for failing to object to the permissible summation comments by the prosecutor. *See, e.g.*, *Archer v. Smith*, No. 12-CV-6182 (BMC), 2013 WL 1122705, at *4 (E.D.N.Y. Mar. 16, 2013) ("A prosecutor is supposed to argue that a defendant committed the crime and doing so does not deprive a defendant of due process.").

### (2) Speculation that petitioner summoned the assailants by phone

The petitioner argues that his counsel was ineffective for failing to object to the prosecutor's summation when the prosecutor argued that the petitioner summoned the assailants by calling them on the phone. The petitioner argues that there was no evidence introduced that purported to establish his call records, nor was evidence offered that tended to show that he was on the phone with any of the assailants.

The prosecutor made the following statements during her summation:

> Tanya told you, Tanya said on direct examination, he wasn't on his phone at all. Is that believeable? Who doesn't touch their phone from noon until eight o'clock at night? What is the big deal? Tanya should have said, yes, he was on

his phone. Everyone is on their phone. It's not a crime to be on your phone. It's totally normal and reasonable, and that's what normally happens.

But she was adamant because her testimony was tailored. Because she was testifying for her boyfriend, the defendant. She knows the phone call was important. Never touched the phone once. [¶] . . . .

But after that phone call, what happens. Right after that phone call, the defendant disappears from the block. For thirty minutes. This isn't random. This isn't a coincidence. . . . .

The defendant's hanging out on the block all day, drinking and barbecuing in the backyard, and right after that phone call is made he disappears for thirty minutes? Not a coincidence.

And the next time, the very next time that anyone sees the defendant it's when that car pulls up. And you saw on the video, as soon as that car pulls up, you see the defendant come.

Tr. 469:10–20; 470:1–4, 11–14.

Earlier, in the defense summation, defense counsel discussed the evidence relating to the phone call and warned jurors that the prosecutor would attempt to use that evidence to argue that the attack was coordinated. Defense counsel pointed out the flaws in the People's case, such as the lack of phone records. *See* Tr. 462:2–4. Counsel also stated that the *only* evidence of coordination was that Sukhu was seen on the phone. Tr. 462:22–25.

Sukhu fails here, too—he cannot show that the Appellate Division unreasonably applied *Strickland* when it denied his ineffective assistance of counsel claim for counsel's failure to object when the prosecutor stated that the petitioner summoned the assailants by phone. Sukhu's claim fails because the prosecutor's statements were based on the evidence presented at trial and were a reasonable response to defense counsel's summation. Roopnarine testified that he saw Sukhu "on his phone walking up and down the block" at around 5:30 p.m. that evening. Tr. 310:2–6. The prosecutor was arguing an inference based on the testimony that was presented at trial—namely, that the jurors should infer that the phone call was not benign but, rather, was part of the petitioner's plan in summoning the other assailants to the scene based on the short period of time that elapsed between Sukhu's phone call and the arrival of the assailants on the scene.

Because the prosecutor's comments fell within the permissible scope of summation, the petitioner cannot show that he was denied effective assistance of counsel.

   *(3) Mischaracterizing the incident and its aftermath;*

The petitioner argues that the prosecutor "played fast and loose with the testimony about the incident and its aftermath." Pet'r's Direct Appeal Br. at 26. The petitioner claims that the prosecutor mischaracterized testimony, which improperly bolstered the testimony of the People's key witnesses. *Id.* This Court finds that prosecutor's statements did not deprive the petitioner of a fair trial and, accordingly, the Appellate Division did not unreasonably apply *Strickland* when it denied this claim.

The petitioner points to one incident in which the prosecutor stated that Seecharran told Detective Curley that "from day one" that Sukhu was the person who attacked Roopnarine. *Id.* (quoting Tr. 473:12–17). The petitioner insists that this statement is inaccurate because neither Seecharran nor Detective Curley said anything about who attacked Roopnarine.

During the trial, Seecharran testified about the conversation that he had with Detective Curley, which occurred on the either the night of the incident or the following day. Seecharran confirmed that, during this conversation, he told Detective Curley that Sukhu was one of the persons who had assaulted them. Tr. 251:12–23, 252:1–2. Seecharran did not identify Roopnarine as one of the victims by name. Detective Curley confirmed that he had spoken with Seecharran in the hospital and asked him about the incident, but Detective Curley did not convey the content of their conversation. Tr. 345:20–25, 346:1–3. Detective Curley also discussed a conversation that he had with Seecharran on October 3, 2013, after which Detective Curley stated that he identified Sukhu as a suspect in the case and issued a police-wide notification asking for help in identifying Sukhu's whereabouts. Tr. 350:15–25, 351:1–3.

During the defense summation, the defense attorney questioned why Detective Curley identified Sukhu as a suspect after speaking with Seecharran. Tr. 452:16–25; 453:1–2. Specifically, the defense counsel questioned how Seecharran could have provided any information to Detective Curley when, according to defense counsel, Seecharran said to the

grand jury that "[Seecharran] did not see the defendant do anything to him" on the night of the incident. Tr. 452:4–7.

The petitioner cannot show that the Appellate Division unreasonably applied *Strickland* because, like before, the prosecutor was reasonably responding to defense counsel's summation and relying on the evidence presented at trial. The evidence at trial showed that Detective Curley spoke with Seecharran shortly after the incident at the hospital and, from an early point, Seecharran identified Sukhu as one of the assailants. The evidence, thus, directly supports the proposition that Seecharran identified Sukhu as an assailant when speaking with Detective Curley. Although evidence was not presented that Seecharran identified Sukhu as a person who attacked *Roopnarine* specifically, that fact can be inferred from Seecharran's use of the words "us" and "them" when speaking about the victims. Furthermore, there is no question that Roopnarine was among the victims—defense counsel was specifically questioning the investigation of Sukhu. Thus, the pertinent part of the prosecutor's statement was that Seecharran named Sukhu from "day one" and not that Roopnarine was identified as a victim.

*(4) Inaccurate statements about the video*

The petitioner next argues that the prosecutor made misstatements to the jury about the video footage of the incident. The petitioner claims that the prosecutor made a false statement when the prosecutor said, "[t]hey told you . . . [w]e watched the video separately. They each told you, we watched the video separately." Pet'r's Direct Appeal Br. at 51 (quoting Tr. 480). The petitioner claims that the statement was false because the evidence at trial established that Shabaint had testified that he had seen the video with Seecharran on the day after the incident. *Id.* (citing Tr. 278–79; 299–300). The petitioner claims that the prosecutor persisted by stating that "[t]he evidence, the testimony you heard, is that we watched it separately, so that's what you have to go with." *Id.* Following this statement, defense counsel objected to the prosecutor dictating to the jury what they "have to go with," and the court sustained the objection. *Id.*

During the People's summation, the prosecutor stated:

> [Defense counsel] wants you to credit my witnesses in so many aspects on so many different things they said.  He wants you to believe that they were attacked, believe that they were really injured, believe that their jewelry was taken.  . . . .  He credits them to so many things except of course the one thing, that the defendant wasn't involved.
>
> So what is it?  Does he want you to believe these witnesses?  Or doesn't he?  He wants you to think that all three witnesses independently are lying?  They told you, we never talked about our testimony together.  We talked to the D.A. separately.  We watched the video separately.  They each told you, we watched the video separately.
>
> On his summation he says they must have watched it together.  That's called assumption, speculation.  That's not the law.  The evidence, the testimony you heard, is that we watched it separately, so that's what you have to go with.

Tr. 480:3–23.  Defense counsel objected and stated "[t]hey don't have to believe anything."  Tr. 480:24–25.  The court sustained the objection and added, "the jury's job [is] to decide what to believe and what not to believe."  Tr. 481:1–2.

Roopnarine testified that he had seen the video at least twice: once immediately before trial and once in the grand jury, and both times he viewed it he was with the prosecutor.  *See* Tr. 326–27.  Shabaint testified that, like Roopnarine, he had viewed the video with the prosecutor immediately prior to trial, but he had also viewed the tape several times with the neighbor who had initially captured the video footage, along with Seecharran and Jaggy and Jaggy's daughter. *See* Tr. 279:1; 291:20–25.  Seecharran testified that he viewed the video footage at least twice and at least one of those times he was with the prosecutor.  *See* Tr. 248:11–18.  Detective Curley testified that he never viewed the video footage with Roopnarine or Seecharran but he did view the footage with Shabaint (also known as "Vish").  Tr. 359:21; 360:8–11.

During summation, defense counsel probed into Detective Curley's investigative tactics. Tr. 452–54.  Defense counsel questioned why Detective Curley named Sukhu as a suspect after Detective Curley's conversation with Seecharran at the hospital immediately following the incident—because, according to defense counsel, Seecharran did not have an independent recollection of Sukhu's involvement.  *Id.*  Defense counsel stated:

> But how could that be?  Because think about this.  Right?  Also, Detective Curley said at that point that he doesn't recall ever watching the video with Kelly.  Right?

22

[¶] But if Kelly didn't see the defendant do anything, then why after speaking to Kelly is there an I-card for the defendant's arrest?

Tr. 452:21–25; 453:1–2.  Defense counsel argued that the defendant had been named as part of a coordinated effort after viewing the video: "So what I'm submitting to you is, again, there was an assumption here.  The defendant gets arrested.  These guys now -- you know that they looked at this video together."  Tr. 455:20–23.  Defense counsel further stated, "Maybe they didn't like [Sukhu].  Maybe they think [Sukhu] is this or that or the other thing.  But they saw him there all day.  I think one of them said he was cursing, just to himself and drinking.  They saw him there. They jumped to conclusions."  Tr. 463:16–20.

When examined in context, it is clear that the prosecutor was responding to the defense summation when the prosecutor stated that the witnesses watched the video separately.  Defense counsel argued that the witnesses watched the video together and coordinated their testimony; the prosecutor argued that they watched the video separately and had an independent recollection of the incident.  And strictly speaking, the petitioner correctly identifies the prosecutor's erroneous statement: Shabaint testified that he had seen the video footage with Seecharran, so not all of the witnesses testified that they had seen the video "separately."  It is not clear, however, that the prosecutor meant his statement literally—when he said "separately" a reasonable juror could understand that word to mean that the witnesses did not *all* watch the footage together.  Defense counsel could have a multitude of strategic reasons for failing to object, including a desire to avoid drawing prominence to unfavorable evidence or avoid the possibility that an objection would lead the prosecutor to engage in a lengthy discussion of trial testimony that might have been more prejudicial to his client's case.  Accordingly, the petitioner has not overcome the "strong" presumption that his counsel was acting in a competent manner and exercising reasonable professional judgment in failing to object to the prosecutor's erroneous statement.  *See Strickland*, 466 U.S. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action

'might be considered sound trial strategy.'" (citation omitted)).  Furthermore, even if the petitioner could overcome the presumption of reasonable assistance, he cannot show that he was prejudiced.  Immediately following the prosecutor's statements at issue here, the court sustained defense counsel's objection and emphasized that it was the jury's job to find facts and assess credibility.  *See* Tr. 481:1–2.

         *(5) Inaccurate statements about the interactions among the people's witnesses*

The petitioner next argues that the prosecutor misstated the evidence at trial when she asked, rhetorically, whether defense counsel "wants you to think that all three witnesses independently are lying?  They told you, we never talked about our testimony together.  We talked to the D.A. separately."  Pet'r's Direct Appeal Br. at 52 (quoting Tr. 480).  The petitioner refers to this portion of the prosecutor's summation as "unsworn testimony" because, according to him, the evidence at trial did not support the notion that the witnesses "never" talked about their testimony together or that they "talked to the D.A. separately."  *Id.*

At trial, Roopnarine testified during cross-examination that he and Seecharran "didn't discuss the case."  Tr. 337:8.  Defense counsel asked, again, "[y]ou never once talked about the night that you got beat up?"  Tr. 337:11–12.  Roopnarine conceded that they "talked but we didn't get in details like what we see on the video."  Tr. 337:13–14.  Defense counsel further asked, "Did you say [Seecharran], hey, the trial of [Sukhu] is here, now, we got to come in here; did you talk about that?"  Tr. 337:24–25.  Roopnarine stated, "Yes, because he's the one that had to pick me up to bring me here."  Tr. 338:1–2.  When defense counsel asked whether that was the "only reason" they had talked about the case, Roopnarine responded, "Yes."  Tr. 338:3–4. Seecharran testified that he had not discussed the incident with Shabaint, see Tr. 246:14, and Seecharran confirmed that he had seen Roopnarine since the incident, but he was not asked whether he had discussed the incident with him.  Tr. 226:14.

Like before, the petitioner has not overcome the presumption of reasonable professional representation, and therefore cannot show that the Appellate Division unreasonably applied *Strickland*.  A prosecutor is not required to quote verbatim from the trial transcript during her

summation remarks.  Instead, a prosecutor can draw inferences and make arguments based on the evidence at trial.  The prosecutor here sought to rebut the defense theory that the witnesses coordinated their testimony to implicate Sukhu in a crime that, according to the defense, he did not commit.  While it is true that the witnesses did not affirmatively state that they "never talked about their testimony together," that fact can be inferred from the evidence at trial and, thus, the petitioner's counsel was not ineffective for failing to object.

(6) *Vouching for the credibility of the people's witnesses*

The petitioner next argues that his counsel was ineffective for failing to object when the prosecutor "affirmatively vouch[ed] for the People's witnesses."  Pet'r's Direct Appeal Br. at 53. The petitioner argues that the prosecutor stated "her own personal belief in the credibility of the witnesses" when the prosecutor stated, in summation, "[b]elieve [the People's witnesses] because they're credible.  Because they are telling you the truth.  They're telling you exactly what he did.  Blame him because he did it." *Id.* at 53 (quoting Tr. 472).  The petitioner argues that the "prosecutor improperly injected her own and the district attorney's integrity into the case." *Id.* (citations omitted).

The Supreme Court has long-recognized the dangers presented by a prosecutor who vouches for the credibility of witnesses:

> [S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence

*United States v. Young*, 470 U.S. 1, 11 (1985) (citing *Berger v. United States*, 295 U.S. 78, 88–89 (1935)).  Nevertheless, "a criminal conviction is not to be lightly overturned," cautioned the Court, "the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.*  "Ordinarily, a prosecutor's misconduct will require reversal of a state court conviction only where the remark sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due

process." *Vega v. Lord*, No. 00-CV-6661 (JBW), 2003 WL 21822636, at *3 (E.D.N.Y. July 7, 2003) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

At the outset, this Court notes that the prosecutor's comments in this case (i.e., "they're credible" and "they are telling you the truth" and "[t]hey're telling you exactly what he did") resemble those in cases where New York courts have reversed for impermissible vouching.  In *People v. Brown*, 26 A.D.3d 392, 393 (2d Dep't 2006), the Second Department reversed where the prosecutor "repeatedly vouched for the credibility of the People's witnesses, stating that they were 'credible and accurate,' and telling the jury that one witness 'told you the truth,' while the other 'told you exactly how it happened.'"  In addition, however, the prosecutor called the defendant's testimony a "load of garbage" and improperly appealed to the jurors' sympathy when the prosecutor said, "[g]od forbid you had a gun pointed at your side." *Id.*  In *People v. Pagan*, 2 A.D.3d 879, 880 (2d Dep't 2003), the Second Department reversed where the prosecutor "repeatedly vouched for the complainant's credibility, stating that he was 'perfectly candid,' 'being forthright,' and 'very accurate,' stating that 'I submit to you that [his] testimony is credible and it is also accurate,' and arguing that he had no motive to lie."  The prosecutor also repeatedly accused the defendant of "lying on the witness stand and tailoring his testimony to fit the People's proof" and the prosecutor "impermissibly shifted the burden of proof to the defendant" and "inappropriately insinuated that the defendant should not have elected to exercise his right to a trial." *Id.*; *see also People v. Blowe*, 130 A.D.2d 668, 671 (2d Dep't 1987) (reversing where the prosecutor improperly vouched for the credibility of witnesses).

But this Court is not reviewing Mr. Sukhu's convictions on direct appeal, and he does not present a standalone claim for improper vouching.  Instead, he claims that his trial counsel was ineffective for failing to object to the prosecutor's alleged improper vouching.  This Court is obligated to review his habeas claim under the deferential AEDPA standard, which means that

"the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Premo*, 562 U.S. at 123 (quoting *Richter*, 562 U.S. at 105).

The petitioner cannot show that he is entitled to habeas relief because the prosecutor's comments in this case were an invited response to the defense summation.  *See Sukhu*, 157 A.D.3d 973 (finding that "most of the comments alleged to be improper were either fair comment on the evidence . . . or responsive to arguments and theories presented in the defense summation).

The Supreme Court has endorsed the so-called "invited response" rule for courts determining claims of prosecutorial misconduct.  *See Young*, 470 U.S. at 12–13; *Darden*, 477 U.S. at 182; *see also United States v. Martinez*, 419 F. App'x 34, 35–36 (2d Cir. 2011).  As the Court has explained, the doctrine is not used "to excuse improper comments, but to determine their effect on the trial as a whole."  *Darden*, 477 U.S. at 182 (citing *Young*, 470 U.S. at 13).  The question is whether "the objectionable content was invited by or was responsive to the opening summation of the defense."  *Id.*  In this sense, the defense may "'open the door' to otherwise inadmissible prosecution rebuttal."  *United States v. Ozsusamlar*, 349 F. App'x 610, 611 (2d Cir. 2009) (quoting *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992)).

Defense counsel repeatedly undermined the identification of his client based on a "grainy surveillance video" as "like the snowball going down the mountain" and referred to the witnesses' cooperation as "[h]og wash."  Tr. 456:4–13.  Defense counsel stated, "Nobody sees a thing.  Nobody saw [Sukhu] do anything."  Tr. 456:7–8.  Defense counsel repeatedly said that the People's witnesses "assumed" that Sukhu was among the assailants, Tr. 453:10, 25; 454:1; 455:21, because the witnesses "looked at this video together."  Tr. 455:22–23; *see also* Tr. 463:15–16 (stating that the witnesses "jumped to conclusions").  Defense counsel also stated that his client was only apprehended because he was the "[o]nly person they recognized in the crowd."  Tr. 460:15–16.  Finally, defense counsel insisted that the witnesses were trying to "frame" his client.  Tr. 463:9.

The prosecutor addressed the defense summation by noting that "[defense counsel] spends a long time . . . here in summation talking about don't blame him because he is the only one we got.  Don't blame him because is the only one that these witnesses can identify."  Tr. 471:12–16.  The prosecutor responded by asking the jurors to "blame him because he did it. Because he is guilty."  Tr. 471:17.  After the prosecutor went through evidence of the defendant's guilt, she then went on to say that the jurors should "[b]elieve them because they're credible.  Because they are telling you the truth.  They're telling you exactly what he did.  Blame him because he did it."  Tr. 472:10–12.

When properly viewed in the context of the trial, the prosecutor's latter statements about the witnesses' credibility, though inappropriate, were clearly responsive to the defense summation.  Thus, this Court finds that any potential harm from these remarks was mitigated by the jury's understanding that the prosecutor was simply refuting defense counsel's repeated attacks on the credibility of the People's witnesses.  *See Young*, 470 U.S. at 18; *McGhee v. Rock*, No. 12-CV-4077 (ERK), 2014 WL 5800650, at *7 (E.D.N.Y. Nov. 7, 2014) (finding no improper vouching where prosecutor stated, in substance, that witness was "telling the truth" where the prosecutor's comments were invited by defense summation); *Morales v. Walsh*, No. 05-CV-2251 (DGT), 2008 WL 2047632, at *7 (E.D.N.Y. May 12, 2008) (finding no prosecutorial misconduct where "much of the defenses' summations were devoting to discrediting" the prosecution's witnesses); *Natal v. Bennett*, 98-CV-1872 (RWS), 1998 WL 841480, *8 (S.D.N.Y. Dec. 3, 1998) (same).

In addition, the defense counsel here objected six times during the People's summation (Tr. 468:25, 476:20, 478:7, 480:24, 481:15, 485:3), which suggests that counsel's failure to object to the challenged comments here was driven by trial strategy that fell within the "wide range of professionally competent assistance."  *Charlemagne v. Goord*, No. 05-CV-9890 (DAB) (HBP), 2008 WL 2971768, at *26 (S.D.N.Y. June 30, 2008) (quoting *Strickland*, 466 U.S. at 690), *R&R adopted*, 2011 WL 2150646 (S.D.N.Y. May 31, 2011); *see also Nova v. Ercole*, 06-CV-562 (NRB), 2007 WL 1280635, at *8 (S.D.N.Y. Apr. 30, 2007) ("Defense counsel did make

28

objections that were sustained during other parts of the summation, suggesting his choice not to object was driven by strategy.").

Finally, the jury was repeatedly told that it was their job to determine the credibility of the witnesses. *See* Tr. 448:23–25; 449:1; 476:22–23. The prosecutor insisted several times that the jury must "listen carefully" to Justice Schwartz, as the court will "tell you exactly what the law is." Tr. 477:24–25; 478:13. The court instructed the jury that they are "the judges of the facts" and asked them to "[c]onsider all the evidence presented whether by the People or by the defendant." Tr. 486:21; 487:9–10. Further the court instructed, "[a]s judges of the facts, you must decide whether a witness told the truth and was accurate or testified falsely or was mistaken. You must also decide what importance to give to the testimony that you accept as truthful and accurate." Tr. 489:8–12. The court stated, "[i]f you find that any witness has intentionally testified falsely as to any material fact, you may disregard that witness' entire testimony or you may disregard so much of it as you find was untruthful and accept so much of it as you find to have been truthful and accurate." Tr. 489:15–19. This Court presumes, as it must absent contrary evidence, that the jury followed the court's instructions and independently found the facts. *See Charlemagne*, 2008 WL 2971768, at *24.

### *(7) Denigrating the defense witness*

The petitioner next argues that his trial counsel was ineffective for failing to object after the prosecutor unfairly attacked the defense by repeatedly denigrating the sole defense witness at trial. The petitioner takes issue with the following statements made by the prosecutor: "[y]ou should discredit [Ms. Boobhoo's] entire testimony. It was completely tailored to help out her friend or the guy she was sleeping with let's be honest." Pet'r's Direct Appeal Br. at 54 (quoting Tr. 481:11–13). Defense counsel recognizes that the court sustained defense counsel's objection to this statement. The prosecutor then went on to discuss Ms. Boobhoo's weekly routine and her drinking habits. *See* Tr. 482:10–18.

The petitioner cannot show that his counsel's failure to renew his objection rendered counsel's representation constitutionally ineffective. As stated previously, the prosecutor could

permissibly rebut the defense summation with respect to the credibility of witnesses, and the prosecutor based the bulk of his comments on evidence that was adduced at trial.  In these circumstances, this Court finds that the Appellate Division did not unreasonably apply *Strickland* when it denied the petitioner's ineffective assistance claim on this ground.

### C. Petitioner's Due Process Claim

In his final claim, the petitioner argues that the prosecutor violated his due process rights when he allowed one of the key witnesses to testify under a false name.  In the § 440.10 motion, the petitioner alleged that Kawall "Vish" Shabaint's real name is actually Kawall Shivbasant.  *See* Mot. Set Aside, ECF No. 8-1, at 160.  This issue was first raised at the end of the sentencing, where the defendant himself audibly objected to one of the orders of protection:

> I have a problem with this one.  . . . .  This is not his real name.  There is a fraud.  This guy who testified, Kawall Shabant (sic), his real name is, his name is spelled wrong.  S-h-a-v, S-h-a-v v-a-s-a-n.  Shirva Shavasan (sic).  That's his real name.  He lied under oath about his name.  He lied to the cops, to the D.A., to everybody here about his real name.  That's why we couldn't pull his criminal background up.

Sentencing Tr. 18:22–25; 19:1–5.  The petitioner said he knew "who it is but that's not his real name."  Sentencing Tr. 19:16–17.  The petitioner said he knew the witness because the witness "dates his cousin" and, according to the petitioner, engaged in criminal behavior in the past.  The petitioner first raised this claim in his § 440.10 motion, and the post-conviction court denied relief.

The petitioner does not provide an excuse for failing to raise this claim on direct appeal in either his present habeas petition or in his § 440.10 motion.  New York courts generally find that claims are procedurally barred when a claim is brought for the first time in a collateral proceeding where the claim could have been raised on direct appeal.  *See, e.g.*, *People v. Stewart*, 16 N.Y.3d 839, 840 (2011); *People v. Cuadrado*, 9 N.Y.3d 362, 365 (2007); *see also Nedd v. Bradt*, No. 13-CV-5569 (CLP), 2019 WL 2124889, at *13 (E.D.N.Y. May 15, 2019).  The petitioner does not argue that the claim could not have been brought on direct appeal, nor does

the petitioner provide an excuse for failing to raise it on direct appeal.  Therefore, this claim is procedurally barred by adequate and independent state law grounds.

Even if the petitioner could overcome the procedural default, however, the claim fails on the merits.  There is no evidence in the record to establish Mr. Shabaint's real name and yet, even if this Court could determine his real name, the petitioner fails to show *how* he was prejudiced by the use of the alleged false name at trial.

## IV.   CONCLUSION

This Court respectfully recommends that the Petition for a writ of habeas corpus be DENIED.  In addition, since the petitioner has not made a substantial showing that his constitutional rights were denied, it is respectfully recommended that a certificate of appealability should not issue.  *See* 28 U.S.C. § 2253(c)(2).  The petitioner may request a circuit judge of the United States Court of Appeals for the Second Circuit to issue the certificate.  Fed. R. App. P. 22(b)(1).

The respondent is directed to serve a copy of this Report and Recommendation on the petitioner and file proof of service with the Court within ten (10) business days.

## V.   OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals.  *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

_____/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated:  Brooklyn, New York
        May 8, 2020